IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2026

**IN RE GRACELYN H.**

**Appeal from the Chancery Court for Henderson County**
**No. 28193     Steven W. Maroney, Chancellor**

_____

**No. W2025-00668-COA-R3-PT**

_____

This is a termination of parental rights appeal. The trial court found clear and convincing evidence to terminate father's parental rights to the minor child on three statutory grounds: abandonment by failure to support, father's confinement as the result of a criminal sentence of ten or more years when the child was under eight years old, and father's failure to manifest an ability and willingness to personally assume legal and physical custody of the child. The trial court further concluded that termination was in the child's best interest. We vacate the trial court's finding as to father's failure to manifest an ability and willingness to assume custody of the child. We affirm the judgment of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in Part; Affirmed in Part; Remanded**

VALERIE L. SMITH, J., delivered the opinion of the court, in which W. NEAL MCBRAYER, J. and D. KELLY THOMAS, SR. J., joined.

Joshua L. Phillips, Lexington, Tennessee, for the appellant, Gregory H.

Leanne A. Thorne, Lexington, Tennessee, for the appellees, Falon D. and Daniel D.

- 1 -

## OPINION

## I.     BACKGROUND & PROCEDURAL HISTORY

Appellant Gregory H. ("Father") and Falon D. ("Mother") were married for approximately six years between 2016 and 2022. Gracelyn H.[1] (the "Child") was born to Mother and Father in December 2017. At the time of the marriage, Mother and Father each had a daughter from a prior relationship: Bella is Father's biological child and Addie is Mother's biological child. Bella and Addie both spent time in Father and Mother's home, while also spending time in their respective mother's and father's homes.

During the marriage, Father participated in the Child's care, including feeding, bathing, diaper changes, and putting the Child to bed. At the time of the Child's birth, Father was employed at Jackson Madison County General Hospital. Shortly after the Child's birth, Mother and Father agreed that Father would leave his employment and serve as a stay-at-home parent during the first year of the Child's life. Mother stayed employed but eventually worked from home due to her fear of leaving the Child alone with Father.

Father admittedly struggled with substance abuse during the marriage. Father abused alcohol and became intoxicated several times a week. Father's demeanor would change when he was intoxicated. During the marriage, Father verbally and physically abused Mother, Bella, and Addie. He turned angry and threatened to kill himself in the presence of Bella and Addie. Father habitually called Mother and the other children demeaning names and would erupt in anger by punching walls and household objects in their presence. This behavior eventually extended to the Child. On multiple occasions, Father struck the children, which included the Child—slapping and hitting them with his open hand or with objects—leaving bruises and causing fear. Mother did not feel safe leaving the Child alone with Father, and as a result the Child has never spent a night in Father's sole care.

After the Child's birth, Mother began to suspect that Father was involved with drugs. In 2019, Father received a citation for driving under the influence. In another incident, Father loaned the family vehicle to a friend. Mother was notified that the friend had been involved in an accident in their vehicle and that there were drugs found in the van. Mother was angry with Father over this incident and told Father to leave the marital home. She did not, however, file for divorce from Father at this time due to her fear of what might happen to Bella and the Child if Father were to be granted individual parenting time with them.

---

[1] In cases involving the potential termination of parental rights, it is the policy of this Court to abbreviate the full names of the children and other parties to protect their identities.

According to Father, he became addicted to methamphetamine in 2018—became sober—and then relapsed in 2022. In March 2022, when the Child was four years old, Father's conduct escalated. One evening, while intoxicated, Father brandished a firearm in front of Mother and the Child, held the gun under his chin, and threatened to "blow [his] head off" in front of them. The Child witnessed this traumatic event, and Mother testified that the Child still spoke of the incident over three years later at the time of trial. After the incident, Mother filed an Order of Protection against Father and went to stay at Father's own father's home.

Mother then took steps to end the marriage. Father agreed to sign divorce paperwork if Mother dropped the Order of Protection against him, which Mother agreed to do. The parties entered into an Agreed Permanent Parenting Plan ("PPP") that provided that the Child would reside with Mother for 365 days per year. The PPP provided Father with only eight hours of supervised visitation every other weekend and required Father to test negative on a comprehensive drug screen before he could seek any expanded or modified visitation. The PPP also obligated Father to pay $274.00 per month in child support beginning April 1, 2022. Father signed the PPP on March 29, 2022. The Henderson County Chancery Court (the "trial court") entered the PPP on April 22, 2022. As discussed further below, Father did not pay any child support to Mother pursuant to the PPP from April 2022 through June 2023.

Mother attempted to permit safe contact between Father and the Child. In April 2022, during a supervised outing for another child's birthday party where the Child and Bella were present, Father became upset at the party because he thought people were talking about him. Father stormed out of the party with Bella, taking her to the shoulder of a busy highway and ranting that they might both be killed by passing a passing vehicle. Mother spent a significant amount of time trying to de-escalate the situation and guide Father and Bella to safety. As Mother drove the family home, Father again exploded in anger: he grabbed the steering wheel, threatened to kill himself and everyone in the car, and attempted to leap from the moving vehicle. After arriving at Mother's home, Father told Bella to get into his truck, or he would "beat her," and then sped off with her. When Father returned to Mother's home, he shoved Bella out of the still moving vehicle, nearly running her over, and then sped away again.

Approximately two days later, the family decided to go to a restaurant. Bella's mother would not allow Bella to visit Father unless Mother was present, and Mother agreed to be present for Bella's sake. The Child was in the backseat of Mother's new car when she spilled a drink. Mother testified that Father "got really upset and punched [the Child] in the head because she did that." This resulted in the Child and Bella crying. By the time the parties arrived at the restaurant, Father was angry. Mother said she would take Bella home. Father then jumped into the driver's seat of the car, nearly having multiple accidents on the drive home. After being prompted by Mother, Father agreed to stop driving and allow

Mother to drive. During the remainder of the drive to return Bella, while Mother was driving, Father grabbed the wheel and tried to push the car into oncoming traffic. Mother testified that Father also acted as if he wanted to slit his wrist with a knife, causing the children to cry. Ultimately, Mother pulled the car over, and Father exited. After dropping off Bella, Bella's mother sent a text message to Mother inquiring what was wrong. Father heard the text voice-read over the car's audio system and became upset once again. He tried to grab the steering wheel, saying he was going to kill Mother, himself, and the Child by driving into traffic. When they arrived home, Father left angrily in the vehicle, running over a lawn mower and street sign in the process. Then he returned to Mother's yard, exited the vehicle and broke the driver's window and windshield of the vehicle with his fist. He then told Mother he had taken many pills and began sitting in the yard screaming. Mother called 911, and Father was charged with domestic assault and was placed on probation in August 2022.

Beginning in June 2022, Mother began traveling to Missouri to visit a friend because she was fearful of staying at home due to Father's behavior. Mother testified that she made a point to return to Tennessee so that Father could continue his parenting time under the PPP. Mother met Daniel D. ("Stepfather") (together with Mother, "Appellees") through her friend while in Missouri. Mother told Father about Stepfather in August 2022. Father was unhappy about this and stated that Stepfather would be killed, either by Father or by one of Father's gang members.

In September 2022, Mother told Father she was permanently relocating to Missouri, which Father said he would accept. Mother sent a certified letter regarding her relocation in January 2023 to Father, who did not object. In June 2023, Mother and the Child moved to Missouri. Mother and Stepfather married in October 2023.

On February 1, 2023, Father was arrested and incarcerated on two felony counts of trafficking methamphetamines. While Father was incarcerated awaiting disposition of those charges, Mother initially allowed the Child to have periodic video visits with him from jail to maintain contact. Mother eventually stopped these calls because Father began bringing other inmates onto the call and telling the Child that these inmates were her "uncles."

Father ultimately pled guilty to the sale and delivery of methamphetamines over 0.5 grams, which is reflected in amended judgments of the Madison County Circuit Court (the "Circuit Court") dated August 8, 2023. As a result, Father received a ten-year sentence in the Tennessee Department of Corrections. The Circuit Court permitted Father to serve an alternative sentence, although he was required to remain in custody until a bed was available at a recovery program called Men of Hope. Father was required to successfully complete the Men of Hope program and entered the intensive treatment program in July 2023.

Father's contact with the Child in the latter half of 2023 was minimal. Due to Mother's move and Father's enrollment in the Men of Hope treatment program, which initially involved a communication "blackout," Father had no contact with the Child from August 2023 until November 2023. In November 2023, Father requested renewed communication, and Mother provided a phone number for Stepfather to facilitate weekly supervised calls between Father and the Child. Father spoke with the Child telephonically roughly once a week for a few minutes at a time. These calls were typically brief, often only two to fifteen minutes in duration, and frequently included the participation of other family members rather than one-on-one conversations.

Mother and Stepfather filed the Petition for Termination of Parental Rights (the "Petition") in the trial court on April 1, 2024. The Petition alleged the following grounds for termination:

(1) Father abandoned the Child by willfully failing to provide financial support for four months preceding the filing of the Petition pursuant to Tennessee Code Annotated section 36-1-102(a)(i);

(2) Father abandoned the Child by failing to visit the Child for four months preceding the filing of the Petition pursuant to Tennessee Code Annotated section 36-1-102(a)(i);

(3) Father was "incompetent to adequately provide for further care and supervision" of the Child because Father's "mental condition" was "presently so impaired and likely to remain so" making it unlikely that Father would "be able to assume or resume care and responsibility" for the Child in the near future; and

(4) Father's sentence to confinement of ten or more years due to his criminal acts at a time when the Child was under eight years of age pursuant to Tennessee Code Annotated section 36-1-113.

The petition also alleged that termination of Father's parental rights was in the Child's best interest. Father was served with process and filed an answer on May 3, 2024, opposing the termination. Father also provided an affirmative defense to the grounds of abandonment by stating that his failure to pay child support or to visit the Child during the four months preceding the filing of the petition was not willful.

The trial court heard testimony on January 23, 2025, and February 25, 2025, from Mother, Father, Stepfather, Bella's biological mother, and other individuals close to the parties. The trial court issued a detailed written ruling on March 19, 2025, which was incorporated into its final judgment on April 10, 2025. The trial court held that Petitioners had proven three grounds for termination by clear and convincing evidence. First, the trial court held that Father abandoned the Child by failing to provide support for the four months

preceding the filing of the Petition. However, the trial court determined that the ground of abandonment by failure to visit had not been proven because Father had shown that his failure to visit was not willful. Second, trial court found that Father's prison sentence triggered abandonment by incarceration under Tennessee Code Annotated section 36-1-113(g)(6), given that the sentence was for ten years or more and the Child was under the age of eight when Father was sentenced. Third, the trial court concluded that Father failed to manifest, by act or omission, the ability and willingness to assume legal and physical custody or financial responsibility of the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(14). The trial court also concluded that it was in the Child's best interest to terminate Father's parental rights. Father timely appealed to this Court on May 8, 2025.

## II. ISSUES PRESENTED

The parties present the following issues for review on appeal:

1. Whether Father abandoned the Child pursuant to Tennessee Code Annotated section 36-1-102(1)(a)(i).

2. Whether Father is incompetent to adequately provide for the further care and supervision of the child because his mental condition is presently so impaired and is likely to remain so that it is unlikely that he will be able to assume or resume the care and responsibility for the Child in the near future pursuant to Tennessee Code Annotated section 36-1-113(g)(8)(B)(i).

3. Whether termination of Father's parental rights is in the Child's best interest pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children," which is guaranteed under both the United States and Tennessee constitutions. *In re Connor B*., 603 S.W.3d 733, 788 (Tenn. Ct. App. 2020) (quoting *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002)). This right is not absolute, however, and may be terminated if a court finds that one of the statutory grounds for termination exists and that termination is in the child's best interest. *See* Tenn. Code § 36-1-113(c)[2]; *Santosky v.*

---

[2] Throughout this Opinion, citations to Tennessee Code Annotated section 36-1-113 refer to the version that was effective on the date the termination petition was filed in this case, which was April 1, 2024.

*Kramer*, 455 U.S. 745 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). Statutory grounds for termination as well as a determination that termination is in the child's best interest must all be found by clear and convincing evidence, which "serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Clear and convincing evidence "'establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Makendra E.*, No. W2015-01374-COA-R3-PT, 2016 WL 325481, at *2 (Tenn. Ct. App. Jan. 27, 2016) (alteration in original) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

In cases involving the termination of parental rights, the standard of appellate review differs slightly from general appellate review under Rule 13 of the Tennessee Rules of Appellate Procedure. The Tennessee Supreme Court has explained this heightened form of review as follows:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023). Those seeking to terminate parental rights must prove the elements of their case by clear and convincing evidence, which includes the statutory grounds and the best interest of the child factors. *In re Carrington H.*, 483 S.W.3d 507, 523 (Tenn. 2016). Because of the nature of the consequences, proceedings to terminate parental rights require an individualized determination. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

## IV.   STATUTORY GROUNDS

### 1. <u>Abandonment</u>

Parental rights may be terminated for abandonment. Tenn. Code Ann. § 36-1-113(g)(1). Relevant to this case, the term "abandonment" includes:

> If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child [.]

*Id.* § 36-1-102(1)(A)(i)(a). A parent has "failed to visit" if he or she has failed for the period of four (4) consecutive months preceding a termination petition, "to visit or engage in more than token visitation." *Id.* § 36-1-102(1)(E). Similarly, the statute defines "failed to support" as the failure, for the four (4) consecutive months preceding the filing of a termination petition, "to provide monetary support or the failure to provide more than token payments toward the support of the child." *Id.* § 36-1-102(1)(D). The statute provides that "it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful." *Id.* § 36-1-102(1)(I). A parent may assert the absence of willfulness, which must be proven by a preponderance of the evidence. *Id.*

(A) <u>Failure to Support</u>

Father argues on appeal that the trial court erred by finding clear and convincing evidence that he abandoned the Child by failure to provide support for the four consecutive months preceding the filing of the Petition pursuant to Tennessee Code Annotated section 36-1-102(1)(a)(i). Father admits that he "did not make payments towards the support of [the Child] during the four months preceding the filing of the Petition." However, Father asserts that his failure to make child support payments was not willful because he was

incarcerated and did not know Mother's address in Missouri to send her child support payments.

Appellees argue that Father's contention that he did not know Mother's address to send child support payments does not overcome the trial court's finding of abandonment as Father had Stepfather's phone number for contact with the Child and could have inquired about a mailing address. The trial court rejected Father's lack of willfulness defense and found clear and convincing evidence that Father failed to visit or support the Child within the preceding four-month period. Our analysis is as follows.

The relevant four-month period in this case was from December 1, 2023, through March 31, 2024. During the determinative period, Father admittedly paid no child support pursuant to the PPP, which was still in effect and required payment of $274.00 per month. The trial court rejected Father's defense that his failure to provide support was not willful, specifically finding that "it is not disputed that during the relevant statutory period Father was engaging in visitation with the Child through the use of [Stepfather's] phone. At no time did Father solicit any information from [Stepfather] on how to send child support payments to Mother." Ultimately, the trial court concluded, the burden of proof for establishing a "lack of willfulness" was on Father, and Father failed to meet his burden.

Upon review, we agree with the trial court's finding that the evidence clearly and convincingly showed that Father abandoned the Child by willfully failing to provide support as set forth in Tennessee Code Annotated section 36-1-113(g)(1).

(B) Failure to Visit

Appellees assert that the trial court erred in determining that Father's failure to visit was not willful and did not constitute abandonment pursuant to Tennessee Code Annotated section 36-1-113(g)(1). However, given our conclusion that clear and convincing evidence supports the ground of abandonment by failure to provide support, we deem the issue pretermitted. *See In re Daisy B.*, No. M2025-00470-COA-R3-PT, 2026 WL 555456, at *5 (Tenn. Ct. App. Feb. 27, 2026).

## 2. Inability to Care for the Child

The second issue raised by Father is whether the trial court erred in holding that Appellees proved grounds for termination under Tennessee Code Annotated section 36-1-113(g)(8)(B)(i), commonly referred to as the "mental incompetence" ground.[3] The trial

---

[3] Tennessee Code Annotated section 36-1-113(g)(8)(B)(i) provides for termination where

[t]he parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or

- 9 -

court did not address this ground in its final order. Rather, the trial court made findings of facts and conclusions of law concerning Tennessee Code Annotated section 36-1-113(g)(14)[4], commonly referred to as "failure to manifest," which was not a ground alleged in the Petition. In their appellate brief, Appellees concede that they pled the mental incompetence ground in their Petition as a ground for the termination of Father's rights. Specifically, the Petition stated:

> [Father] is incompetent to adequately provide for the further care and supervision of the [C]hild because [Father's] mental condition is presently so impaired and so likely to remain so that it is unlikely that [Father] will be able to assume or resume care of and responsibility for the [C]hild in the near future, to wit:
>
> a. Father has had an ongoing and persistent addiction to illicit drugs;
>
> b. Father has mental health issues that preclude him from adequately parenting the [C]hild;

Although the source of the confusion is not entirely clear, Appellees assert that the parties tried the ground of failure to manifest by consent, and that there was no opposition from Father when Appellees' counsel stated that they intended to prove this ground in open court. While "a ground for termination not included in the petition properly can be found if the ground was tried by implied consent," *In re Eimile A.M.*, No. E2013-00742-COA-R3-PT, 2013 WL 6844096, at *5 (Tenn. Ct. App. Dec. 26, 2013), on our review of the record, we are not convinced that the failure to manifest ground was tried by consent. We have explained that

> [i]n determining whether a ground was tried by implied consent, it must be clear "that the parent fully understood that this particular upheld ground for termination was being tried and that the parent impliedly consented to the

---

guardian will be able to assume or resume the care of and responsibility for the child in the near future.

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

[4] Tennessee Code Annotated section 36-1-113(g)(14) provides:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14).

trial of that ground even though it had not been pled." *In re Johnny K.F.*, [No. E2012-02700-COA-R3-PT,] 2013 WL 4679269, at *8 [(Tenn. Ct. App. Aug. 27, 2013)]. Additionally, it must be clear that "the evidence presented relevant to the unpled ground had *no relevance to any other issue* being presented to the [t]rial [c]ourt." *In re Eimile A.M.*, 2013 WL 6844096, at *5 (emphasis added).

*In re Noah A.*, No. E2019-01633-COA-R3-PT, 2020 WL 6538461, at *9 (Tenn. Ct. App. Nov. 6, 2020). Turning to the transcript, the trial court began the trial by outlining its understanding of the grounds being tried, with failure to manifest being one of the grounds the trial court mentioned. The trial court did not mention the mental incompetence ground. Father's counsel neglected to object or explain that the mental incompetence ground was pled in the Petition but that failure to manifest was not. However, during closing arguments, the following exchange occurred between the trial court and Father's counsel:

> Father's counsel: . . . The first thing I would like to address is [Appellees'] grounds. You know, Your Honor, we don't dispute that he does have a ten-year sentence and that he's on probation for that sentence. However, I do think we've disproven the other three grounds. And I know only one needs to be proven. However, I think it's important to address the other three as well.
>
> Trial Court: Let me interrupt you one second. Just I want to make sure I'm following. You said . . . the other three grounds.
>
> Father's counsel: Uh-huh. So they're – based on what I've reviewed, they've got four. The first one is failure to pay child support, which is part of abandonment, is my understanding. The second one is failure to visit the [C]hild for the four months prior to the filing. Third ground is that he's incompetent to adequately provide care and supervision of the [C]hild due to ongoing persistent addiction to illicit drugs and mental health issues. And then the last one is the ten-year sentence.

The record also shows that a portion of Father's proof was the testimony of Dr. Colton Gramse, a clinician who examines, diagnoses, and treats mental health disorders. Dr. Gramse testified that he conducted three psychiatric evaluations on Father, and he also testified to Father's mental health diagnoses, treatment, and progress. Taken with Father's counsel's closing arguments, discussed above, Father's presentation of Dr. Gramse as a witness and the content of his testimony indicates that Father believed he was defending against the mental incompetence ground, *i.e.,* Tennessee Code Annotated section 36-1-113(g)(8)(B)(i). "The strict application of procedural requirements in cases involving the termination of parental rights requires that before there can be a finding that a ground for termination not alleged in the petition was tried by implied consent, the record must be

clear that such ground indeed was tried by implied consent." *In re Johnny K.F.*, 2013 WL 4679269, at *8. On our review, it appears that Father intended to try the mental incompetence ground, rather than the failure to manifest ground, *i.e.,* Tennessee Code Annotated section 36-1-113(g)(14). As such, we cannot conclude that the failure to manifest ground was tried by consent, and Father's parental rights cannot be terminated under it. Accordingly, we vacate the trial court's termination of Father's parental rights under Tennessee Code Annotated section 36-1-113(g)(14).

### 3. Incarceration

The trial court also found that Appellees proved that Father's parental rights to the Child could be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(6)(A), which provides that parental rights may be terminated if:

> (6)(A) The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court; or
>
> (B) The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of one (1) or more criminal acts, under a sentence of six (6) or more years, and one (1) or more other grounds within this subsection (g) have been satisfied[.]

Although Father does not raise this as an issue on appeal or otherwise challenge the trial court's conclusion that he was sentenced to a term of imprisonment for ten years while the Child was under eight years of age, we are nevertheless obliged to consider whether the evidence clearly and convincingly established that grounds existed to terminate Father's parental rights. *In re Carrington*, 483 S.W.3d at 511 (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

The trial court found that Appellees proved, by clear and convincing evidence, that grounds existed for termination of Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(6)(A). We agree. It is undisputed that Father was sentenced to ten years in prison. At the time the sentence was imposed on July 11, 2023, the Child was five years old. This satisfies the statute's requirement of a sentence of ten or more years imposed while the child is under eight. The fact that Father did not serve the entire sentence in confinement does not make this ground inapplicable. "While the statute requires some period of confinement, the legislature did not expressly provide that the

actual period of confinement must amount to 10 or more years." *In re Chandler M.*, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *7 (Tenn. Ct. App. July 21, 2014) (upholding termination of father's parental rights where he served one year in jail and eleven years on probation); *In re Caleb F.N.P.,* No. M2013-00209-COA-R3-PT, 2013 WL 5783141, at *13 (Tenn. Ct. App. Oct. 25, 2013) (upholding termination of mother's parental rights when she was only ordered to serve 12 days of her sentence in confinement). Accordingly, we affirm the trial court on this ground.

## V. BEST INTEREST OF THE CHILD

Finally, Father argues that termination of his parental rights is not in the Child's best interests. He maintains that termination is premature and unnecessarily severs a meaningful familial bond. Father contends that severing his parental rights would cause unnecessary harm to the Child. Appellees emphasize that the best interest analysis must be viewed from the Child's perspective and that the statutory factors overwhelmingly favor termination due to the Child's need for safety, stability, and permanence. Appellees further note that the Child is thriving in her current home and that adoption would provide immediate permanency. The trial court concluded that termination of Father's parental rights is in the Child's best interests.

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and Child diverge, and the focus shifts to what is in the Child's best interest. *Audrey S.*, 182 S.W.3d at 877; *see also Carrington*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated section 36-1-113(i) contains a nonexclusive list of best interest factors for a court to consider. The factors may include, but are not limited to:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;
(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child

- 14 -

or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." *Id.* § 36-1-113(i)(3).

The list of factors is not exhaustive, and the statute does not require the trial court to find the existence of every factor before concluding that termination is in the best interest of the child. *See Carrington H.*, 483 S.W.3d at 523; *Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). The best interest of a child must be determined from the child's perspective rather than the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). The statute further provides that "[w]hen considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

In this case, the trial court found the following factors applicable: Tennessee Code Annotated sections 36-1-113(i)(A), (B), (C), (D), (E), (F), (G), (H), (I), (J), (K), (M), (N), (O), (P), (Q), (R), (S), (T). We begin by examining the factors relevant to the Child's emotional, physical, and mental needs. *See id.* §§ 36-1-113(i)(A), (B), (D), (E), (F), (H), and (I). The trial court first addressed the importance of permanence and stability noting that the Child "is in a loving home free of violence and abusive behavior." Further, changing the Child's caretakers "would have a negative effect on her emotionally and psychologically because [the] Child has expressed fear and anxiety at even the suggestion of returning to Tennessee and the negative experiences she had there while regularly exposed to Father." While Father has maintained brief contact with the Child, she

- 15 -

"expressed fear about even entering the same state as Father, much less living in Father's home." Additionally, the Child has created a healthy parental attachment with Stepfather. Thus, the trial court concluded that returning the Child to Father's care would be detrimental to the Child's emotional, physical, and mental wellbeing.

We next consider the factors related to whether Father can meet the Child's needs. *See id.* §§ 36-1-113(i)(C), (G), (J), (K), (M), (N), (O), (P), (Q), (R), (S), and (T). The trial court found that Father had not been able to demonstrate continuity and stability. The trial court recognized Father's tremendous work to rebuild his personal life; however, it found that Father cannot "meet his own independent housing and material needs." Further, the trial court noted that the notion of returning to Father's care "produced visible anxiety in [the] Child." Additionally, the trial court found that Father "has not been able to create and maintain an independent home to meet [the] Child's basic and specific needs where she can thrive," which includes the failure to provide any financial support since April 2022. While the trial court acknowledged that Father had taken significant steps, the court found that the Child did not have a relationship with Father to support reunification.

After considering the factors and assessing their weight, the trial court determined that Appellees had proven by clear and convincing evidence that it was in the best interest of the Child for Father's parental rights to be terminated. Upon our own review of the record, we conclude that the trial court properly weighed the relevant factors and did not err in finding that clear and convincing evidence established that termination was in the Child's best interest. *See Carrington H.*, 483 S.W.3d at 539 (finding that termination is proper when the combined weight of the factors demonstrates that termination is in the child's best interest).

## VI. CONCLUSION

For the foregoing reasons, we vacate the trial court's holding as to Tennessee Code Annotated section 36-1-113(g)(14). We affirm the judgment of the trial court in all other respects. Costs are taxed to the Appellant Gregory H., for which execution may issue if necessary.

/s/ Valerie L. Smith_____
VALERIE L. SMITH, JUDGE